**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| BLACK STAR FARMS, LLC, et al., ) | No. CV 05-2620-PHX-MHM |
| ) | |
| Plaintiffs, ) | **ORDER** |
| ) | |
| v. ) | |
| ) | |
| JERRY OLIVER, in his official capacity ) | |
| as Director of the State of Arizona ) | |
| Department of Liquor Licenses and ) | |
| Control, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| ALLIANCE BEVERAGE ) | |
| DISTRIBUTING COMPANY, LLC, ) | |
| ) | |
| Intervenor-Defendant. ) | |
| ) | |
| _____ ) | |

        Currently before the Court are Plaintiffs Black Star Farms, LLC, John Norton, Gary
and Michelle Frisch, and David and Melissa Monheit's motion for summary judgment
pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP") (Dkt. #72); Defendant
Jerry Oliver and Intervenor-Defendant Alliance Beverage Distributing Company, LLC's
cross-motions for summary judgment (Dkt. #s 75, 76); and Intervenor-Defendant's motion
to strike the affidavit of William M. Nelson (Dkt. #82).  After reviewing the pleadings and
holding oral argument on January 24, 2008, the Court issues the following Order.

**I.      Background**

1    Plaintiffs challenge the constitutionality of Arizona's statutory scheme regulating the

2    sale and distribution of wine and other alcoholic beverages.  Plaintiff Black Star Farms, LLC,

3    is a Michigan-based commercial winery that produces approximately 35,000 gallons of wine

4    per year and would like to ship its wine directly to Arizona residents (Plaintiff's Statement

5    of Facts ("PSOF") ¶¶ 1, 5).  Plaintiffs John Norton, Gary and Michelle Frisch, and David and

6    Melissa Monheit are Arizona residents that would like to have wine shipped directly to them

7    from out-of-state wineries such as Black Star Farms, LLC (PSOF ¶¶ 3, 5-6).  Defendant Jerry

8    Oliver is sued in his official capacity as the Director of Arizona's Department of Liquor

9    Licenses and Control, and Alliance Beverage Distributor, LLC, is a licensed Arizona

10   wholesaler of alcoholic beverages that the Court granted status as an intervenor-defendant

11   pursuant to FRCP 24.

12   Plaintiffs brought suit under 42 U.S.C. § 1983 and seek a declaratory judgment that

13   the State's licensing provisions governing wine sales and distribution are unconstitutional

14   on the ground that they constitute impermissible discrimination in violation of the Dormant

15   Commerce Clause of the U.S. Constitution.  Plaintiffs also seek to enjoin the State from

16   enforcing those provisions and to require the State to permit all wineries to sell and deliver

17   wine directly to Arizona residents.  In response, Defendant and Intervenor-Defendant filed

18   cross-motions for summary judgment requesting that the Court reject all of Plaintiffs' claims

19   and grant summary judgment in their favor.  (Dkt. #72, 75).  Thus, the Court construes the

20   cross-motions for summary judgment as requests to deny Plaintiffs' motion for summary

21   judgment.

22

23   **A.   The Statutory Scheme**

24   Arizona, like many states, regulates the sale and distribution of wine and other

25   alcoholic beverages through a three-tiered distribution system that involves producers,

26   wholesalers, and retailers.  Arizona Revised Statutes ("A.R.S.") §§ 4-243.01, 4-244(7).

27   Arizona's Alcoholic Beverages Code, A.R.S. § 4-101 et seq., creates a three-tiered system

28   under which state-licensed producers and primary suppliers of alcoholic beverages deliver

their products to state-licensed wholesalers, who, in turn, sell and deliver to state-licensed retailers, who then sell and deliver the alcoholic beverages to Arizona consumers.  A.R.S. §§ 4-243.01(A), 4-244(7), and 4-203.04(E-H).   Three-tiered systems such as this are considered "unquestionably legitimate"; a constitutional exercise of State power under the Twenty-First Amendment for the purpose of controlling the distribution of alcoholic beverages, promoting temperance, and facilitating means of collecting excise taxes. Granholm v. Heald, 544 U.S. 460, 466 (2005); North Dakota v. United States, 495 U.S. 423, 432 (1990).   However, the licensing provisions of Arizona's Alcoholic Beverages Code riddle Arizona's three-tiered distribution system with exceptions.  The question presented is whether these exceptions affect the legitimacy of Arizona's three-tiered distribution system and amount to an unconstitutional exercise of State power under the Twenty-First Amendment in conflict with the anti-discrimination norm of the Dormant Commerce Clause.

Plaintiffs specifically challenge the exceptions created in Arizona's direct shipment license, A.R.S. § 4-203.04, and domestic farm winery license, A.R.S. § 4-205.04.  Under A.R.S. § 4-203.04, the Director of Arizona's Department of Liquor Licenses and Control may issue a "direct shipment license" to wineries that meet certain statutory requirements listed in that section. A.R.S. § 4-203.04(E) provides that Arizona consumers that are twenty-one years of age or older may place remote orders (i.e., orders placed by telephone, mail or catalog, or through the internet) with wineries that hold direct shipment licenses.  However, A.R.S. § 4-203.04(F)&(G) mandate that wineries with direct shipment licenses adhere to the State's three-tiered distribution system, and ship orders placed under section 4-203.04(E) to state-licensed wholesalers rather than direct to the Arizona consumer.  Nevertheless, A.R.S. § 4-203.04(J) creates the following exception to § 4-203.04(F)&(G)'s three-tiered shipment decree:  "Notwithstanding any other law, a person may ship wine as long as . . . [t]he wine was purchased while the purchaser was physically present at the winery. . . . [and] [t]he winery ships not more than two cases of wine per winery to the purchaser in any calendar year."  Thus, section 4-203.04(J) makes it lawful for a winery to directly ship up to two cases of wine per year to an Arizona resident as long as he or she purchases the wine while

1  physically present at the winery.  However, Plaintiffs contend that this "in-person exception"

2  to Arizona's three-tiered distribution system impermissibly favors in-state wineries and

3  constitutes discrimination against interstate commerce.

4      Under A.R.S. § 4-205.04, the Director of Arizona's Department of Liquor Licenses

5  and Control may issue a "domestic farm winery license" to wineries that produce between

6  200 and 40,000 gallons of wine per year, provided that they meet the statutory requirements

7  listed in that section.   A.R.S. § 4-205.04(A)&(C).   A.R.S. § 4-205.04(C)(4)&(10)

8  incorporates the in-person requirement created in the direct shipment license under A.R.S.

9  § 4-203.04(J) into the domestic farm winery license.  In addition, under A.R.S. § 4-

10 205.04(C)(5), a domestic farm winery licensee may purchase and sell wine produced by other

11 licensed domestic farm wineries as long as the wine is sold to Arizona residents while they

12 are physically present on the winery premises.  But the crucial exceptions to Arizona's three-

13 tiered distribution system are created under A.R.S. § 4-205.04(C)(7)-(9) and are only

14 available to domestic farm winery licensees that produce less than 20,000 gallons of wine

15 per year.  A.R.S. § 4-205.04(C)(7) states that "[a] licensed domestic farm winery that

16 produces not more than twenty thousand gallons of wine in a calendar year may make sales

17 and deliveries of the wine . . . to on-sale and off-sale retailers"; and A.R.S. § 4-205.04(C)(9)

18 states that such wineries "may make sales and deliveries of wine . . . to consumers off of the

19 licensed premises and that is ordered by telephone, mail, fax or catalogue, through the

20 internet or by other means."  Thus, domestic farm winery licensees that produce less than

21 20,000 gallons of wine per year may ship their wine directly to both retailers and Arizona

22 consumers.  There is no limit on how much wine an on-sale or off-sale retailer or Arizona

23 consumer may remotely purchase and directly receive from a licensed domestic farm winery

24 that produces less than 20,000 gallons of wine per year.  In effect, the domestic farm winery

25 license releases licensed wineries that produce less than 20,000 gallons of wine per year from

26 Arizona's three-tiered distribution system and the requirement of distributing wine through

27 licensed wholesalers.  Like the in-person exception, Plaintiffs contend that this "gallonage

28

- 4 -

1  cap exception" to Arizona's three-tiered distribution system impermissibly favors in-state
2  wineries and constitutes discrimination against interstate commerce.

3
4     **B.  U.S. & Arizona Wineries**

5       In 2004, there were approximately 2,500 wineries in the United States.  (Dkt. #72, Pl.
6  Ex. N, WineAmerica, The National Association of American Wineries,
7  http://www.americanwineries.org/newsroom/data.htm (follow "Size Distribution of
8  Wineries," "Wineries by State," and "US Wine Production" hyperlinks)).  In 2007, that
9  number grew to approximately 4,700.  (Id.)  But only a small fraction of those wineries, 27
10 out of 4,700 (or 1.7%), are located in Arizona.  (Id.)

11      In 2004, American wineries produced approximately 550 million gallons of wine;
12 approximately 85% of that, or about 470 million gallons, came from only 49 wineries across
13 the United States, a mere 2% of all U.S. wineries (Id.).  In fact, 45% of U.S. wineries
14 produced less than 5,000 gallons of wine in 2004, and 11.3 % produced only 5,000-10,000
15 gallons of wine (Id.).  Thus, more than 50% of all U.S. wineries produced less than 10,000
16 gallons of wine in 2004.  Moreover, although total U.S. wine production grew to
17 approximately 800 million gallons between July 2005 and June 2006, that increase was
18 primarily due to an increase in the already substantial number of wineries with low
19 production capacity.  (Id.; Granholm, 544 U.S. at 467).

20      From July 2005 to June 2006, Arizona wineries produced a mere 32,031 gallons of
21 wine.  (Dkt. #72, Ex. N).  Currently, 26 out of 27 Arizona wineries produce less than 20,000
22 gallons of wine per year.  (Id.; PSOF ¶ 3).  The one other Arizona winery produces between
23 20,000 and 40,000 gallons of wine per year.  (PSOF ¶¶ 3, 4).  Thus, all Arizona wineries are
24 potentially eligible for a domestic farm winery license; and, unsurprisingly, Arizona has
25 issued domestic farm winery licenses to all 27 wineries.  (DSOF ¶ 41).  As such, 26 out of
26 27 Arizona wineries are in effect released from Arizona's three-tiered distribution system and
27 may bypass the wholesaler tier and ship their wines directly to Arizona retailers and
28 consumers.

1

### C.  The Plaintiffs' Challenge

2      Plaintiffs contend that the in-person and gallonage cap exceptions to Arizona's three-

3   tiered distribution system are clearly discriminatory and argue that the State must establish

4   that the exceptions serve a legitimate state interest that cannot be achieved through any less

5   discriminatory means, a burden that Plaintiffs contend the State cannot meet.  Plaintiffs

6   concede that if the Court finds that Arizona's statutes are not patently discriminatory, then

7   the statutes should be upheld.  (Dkt. #78, p.4, n.3; Dkt. #83, p.1; Dkt. #98, p.27).  Plaintiffs

8   contention is narrow; they do not argue that the statutory scheme is discriminatory either on

9   its face or in its purpose, but instead assert that the in-person and gallonage cap exceptions

10  are discriminatory in effect.  Accordingly, the only question that the Court faces is whether

11  Arizona's facially neutral statutory scheme, which in effect permits most in-state wineries

12  to ship wine directly to consumers and retailers but restricts the ability of some out-of-state

13  wineries to do the same, patently violates the anti-discrimination norm of the Dormant

14  Commerce Clause?

15     Plaintiffs argue that Arizona's in-person exception allowing direct sales to take place

16  on winery premises (as well as the corresponding ability to directly ship two cases of wine

17  per year that are purchased in the same fashion) effectively prevents out-of-state wineries,

18  many of which are geographically distant, from enjoying any real opportunity to sell directly

19  to Arizona consumers.  Plaintiffs continue that in-state wineries, on the other hand, are not

20  similarly disadvantaged because Arizona consumers can much more easily travel to these

21  wineries.  So, as Plaintiffs' argument unfolds, the effect of the in-person exception is to raise

22  the cost of, for example, Michigan or Rhode Island wines, as compared to Arizona wines,

23  since the former will only be available to the Arizona consumer after hefty markups by

24  wholesalers and retailers.  In addition, Plaintiff's state that some out-of-state wineries might

25  not be able to get a state-licensed wholesaler to carry their product in the first place.  Thus,

26  Plaintiffs contend, some out-of-state wineries would have to open off-site locations within

27  Arizona in order to access Arizona's wine market.  However, as Plaintiffs acknowledge, this

28  argument only pertains to wineries that produce over 20,000 gallons of wine per year and

1  thus aren't able to obtain a domestic farm winery license that would allow them to bypass

2  the three-tiered distribution system and ship their wine directly to Arizona retailers and

3  consumers.

4       Plaintiffs main argument is that Arizona's gallonage cap exception, which allows

5  wineries that produce less than 20,000 gallons of wine per year to ship wine directly to

6  Arizona retailers and consumers, patently discriminates against out-of-state wineries that

7  produce more than 20,000 gallons of wine per year, because those wineries are required to

8  adhere to Arizona's three-tiered distribution system and endure the increased costs that result

9  from middleman markups.  Plaintiffs assert that the effect of the gallonage cap exception is

10 to create a statutory scheme under which Arizona wineries are exempted from the economic

11 obstacles imposed on out-of-state wineries by Arizona's three-tiered distribution system.  In

12 support of that contention, Plaintiffs point to the fact that 26 out of Arizona's 27 wineries fall

13 under the gallonage cap exception and are thus exempt from the State's three-tiered

14 distribution system, whereas the hundreds of out-of-state wineries that produce more than

15 20,000 gallons of wine per year may only access Arizona's consumers through in-person

16 sales or the three-tiered distribution system.

17

18 **II.     The Dormant Commerce Clause**

19      The Commerce Clause, Article I, § 8 of the U.S. Constitution, grants Congress the

20 power to regulate commerce among the States.  This affirmative grant of power has long

21 been understood, by necessary implication, to prohibit the States from enacting laws that

22 discriminate against interstate commerce.  New Energy Co. v. Limbach, 486 U.S. 269, 273

23 (1988).  The doctrine that embodies this principle is commonly referred to as the Dormant

24 Commerce Clause, which holds that a state law that discriminates against interstate

25 commerce will be sustained only when it promotes a legitimate state interest that cannot be

26 achieved through any reasonable nondiscriminatory alternative.  Cherry Hill Vineyard, LLC

27 v. Baldacci, 505 F.3d 28, 33 (1st Cir. 2007).  In other words, under the Dormant Commerce

28 Clause, a State may not impede the flow of goods between the states and engage in

1    "economic protectionism," which includes enacting regulations "designed to benefit in-state

2    economic interests by burdening out-of-state competitors." New Energy, 486 U.S. at 273-74;

3    S.D. Myers, Inc. v. City and County of San Francisco, 253 F.3d 461, 466 (9th Cir. 2001)

4    ("The 'central rationale' of the dormant Commerce Clause 'is to prohibit state or municipal

5    laws whose object is local economic protectionism, laws that would excite those jealousies

6    and retaliatory measures the Constitution was designed to prevent.'") (citing C & A Carbone,

7    Inc. v. Town of Clarkstown, 511 U.S. 383, 390 (1994)).  However, the Dormant Commerce

8    Clause does not protect the particular structure or methods of operation in a retail market; and

9    likewise it does not protect any particular interstate business.  Exxon Corp. v. Governor of

10   Maryland, 437 U.S. 117, 127-28 (1978).

11          As such, if a plaintiff establishes that a state statute, either on its face, in its purpose,

12   or in its practical effect, patently discriminates against the flow of interstate commerce, then

13   the statute is subject to heightened scrutiny and the burden shifts to the State to establish that

14   the statute serves a legitimate state interest that cannot be achieved through any less

15   discriminatory means.  Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S.

16   573, 579 (1986) ("When a statute directly regulates or discriminates against interstate

17   commerce, or when its effect is to favor in-state economic interests over out-of-state

18   interests, we have generally struck down the statute without further inquiry.").  Thus,

19   "[w]here simple economic protectionism is effected by state legislation, a virtually per se rule

20   of invalidity has been erected."  Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978).

21   However, this constitutional rule of thumb "applies only when no legislative objective other

22   than protectionist ones are 'credibly advanced' or where legislation results in 'patent

23   discrimination against interstate trade.'"  Spoklie v. Montana, 411 F.3d 1051 (9th Cir. 2005)

24   (citing New Jersey, 437 U.S. at 617).

25          Moreover, there is a distinction between state statutes that patently discriminate

26   against interstate commerce, and those that only incidentally burden commerce.  Maine v.

27   Taylor, 477 U.S. 131, 138 (1986).  A state law that applies evenhandedly to in-state and out-

28   of-state entities and only incidentally burdens interstate commerce is subject to a less

searching scrutiny under a balancing test, which operates to validate the statute unless it burdens commerce in a way that is "clearly excessive in relation to the putative local benefits" to be derived therefrom.   Pike v. Bruce Church, 397 U.S. 137, 142 (1970); Brown-Forman, 476 U.S. at 579 ("When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.").   The burden remains on the party challenging the statute to establish that the burden on interstate commerce is clearly excessive in relation to the putative local benefits. Kleenwell Biohazard Waste v. Nelson, 48 F.3d 391, 399 (9th Cir. 1995).   However, the extent of the burden that will be tolerated depends on "the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Pike, 397 U.S. at 142.   The party challenging the statute "must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." Spoklie v. Montana, 411 F.3d 1051 (9th Cir. 2005) (citing Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 464 (1981)).   As such, a statute may be struck down under the Pike analysis as "unreasonable or irrational when the asserted benefits of the statute are in fact illusory or relate to goals that evidence an impermissible favoritism of in-state industry over out-of-state industry." UFO Chuting of Hawaii, Inc. v. Smith, 2007 WL 4180597 at *5-6 (9th Cir. 2007) (citation omitted).

**A.  Arizona's Statutory Scheme Is Not Per Se Invalid**

Plaintiffs' argument that Arizona's statutory scheme is patently discriminatory is unpersuasive.  At the end of the day, Plaintiffs fail to carry their initial burden of showing that Arizona's in-person and gallonage cap exceptions are patently discriminatory in their effect on interstate commerce.

Plaintiffs' cite numerous cases in attempting to convince the Court to apply the anti-discrimination norm of the Dormant Commerce Clause to invalidate Arizona's facially

1   neutral and evenhanded statutory scheme.  But these cases are distinguishable, and thus not

2   controlling in the instant action.  Further, depending on the argument, Plaintiffs tend to

3   overstate or ignore the actual application of Arizona's statutory scheme.

4

5                              **1.   Granholm v. Heald**

6         Plaintiffs rely most heavily on the Supreme Court's decision in Granholm to support

7   their contention that Arizona's statutory scheme violates the Dormant Commerce Clause.

8   However, Granholm is not the panacea that Plaintiffs make it out to be; and apart from

9   topical similarity, its practical import to the instant case is limited.  In Granholm, the

10  Supreme Court held that the Twenty-First Amendment, which empowers States to regulate

11  the sale and distribution of alcoholic beverages, does not likewise empower States to

12  discriminate against interstate commerce in violation of the Dormant Commerce Clause. 544

13  U.S. at 493; Baldacci, 505 F.3d at 35 ("The novel aspect of Granholm was the Court's

14  holding that the Twenty-First Amendment–a constitutional provision dealing with the

15  regulatory power of the several states in regard to the manufacture, distribution, and sale of

16  alcoholic beverages–cannot salvage explicitly discriminatory regimes even though the

17  regulated product is an alcoholic beverage.").  In other words, the Twenty-First Amendment

18  does not trump the anti-discrimination norm of the Dormant Commerce Clause.  The

19  Granholm court went on to invalidate Michigan and New York statutes that created

20  exceptions to the states' respective three-tiered distribution systems because the exceptions

21  in effect allowed only in-state wineries, to the exclusion of all out-of-state wineries, to bypass

22  the states' three-tiered distribution systems and ship directly to consumers. 544 U.S. at 473-

23  75.

24        The Granholm court acknowledged that "States have broad power to regulate liquor

25  under § 2 of the Twenty-First Amendment," and that States possess "virtually complete

26  control over whether to permit importation or sale of liquor and how to structure [their]

27  liquor distribution system." 544 U.S. at 488.  The purpose of the Twenty-First Amendment

28  is "to allow States to maintain an effective and uniform system for controlling liquor by

1   regulating its transportation, importation, and use." Id. at 484.  Indeed, States may "funnel
2   sales through [a] three-tiered system," a distribution system that the Supreme Court
3   recognizes as "unquestionably legitimate."  Id. at 489.  Thus, in the context of regulating
4   alcoholic beverages, States may enact barriers to interstate commerce, such as three-tiered
5   distribution systems.

6       However, "[t]he [Twenty-First] Amendment did not give States the authority to pass
7   nonuniform laws in order to discriminate against out-of-state goods."  Id. at 486.  Although
8   the Twenty-First Amendment repealed the Eighteenth Amendment to end Prohibition, it did
9   not similarly act to end the Dormant Commerce Clause's prohibition on discrimination
10  against interstate commerce. Id. at 486 ("[T]he Twenty-first Amendment does not supersede
11  other provisions of the Constitution and, in particular, does not displace the rule that States
12  may not give a discriminatory preference to their own producers.").  Indeed, "state regulation
13  of alcohol is limited by the nondiscrimination principle of the Commerce Clause," and
14  "[s]tate policies are protected under the Twenty-first Amendment [only] when they treat
15  liquor produced out of state the same as its domestic equivalent."  Id. at 487, 489.  Despite
16  the States' broad powers to regulate the sale and distribution of alcoholic beverages under
17  the Twenty-First Amendment, the Commerce Clause acts as a check on that power, to ensure
18  that States do not enact laws that impermissibly burden interstate commerce.  The Commerce
19  Clause only guarantees an open market, a market free from prohibitive or burdensome
20  regulations; but it does not guarantee a market free from all regulation.  Exxon, 437 U.S.
21  127-28.  As such, under the Twenty-First Amendment, States may engage in a process of
22  balkanization by using regulations such as a three-tiered distribution system to create gated
23  communities composed of state consumers, but not gated communities that include in-state
24  businesses to the exclusion of all out-of-state businesses.  The question here is whether
25  Arizona may create a gated community that includes most in-state wineries as well as some
26  out-of-state wineries, i.e. those that produce less than 20,000 gallons of wine per year, while
27  using its three-tiered distribution system as a gate to restrict the inflow of wine from some
28  out-of-state wineries, i.e. those that produce more than 20,000 gallons of wine per year.

On that question, <u>Granholm</u> does not provide an answer. The <u>Granholm</u> court merely invalidated two state laws that allowed all in-state, but no out-of-state, wineries to bypass the states' three-tiered distribution system and ship wine directly to in-state consumers. 544 U.S. at 473-75. In other words, Michigan and New York's statutes used the three-tiered system to create a gated community that included all in-state wineries to the exclusion of all out-of-state wineries. The Court found that Michigan and New York's regulatory schemes "by their own terms" discriminated against interstate commerce. <u>Id.</u> at 476. The Michigan scheme was discriminatory on its face – it allowed in-state wineries to ship directly to consumers, whereas all out-of-state wineries faced a complete ban on direct shipment. <u>Id.</u> at 473-74. The New York scheme required that all out-of-state wineries establish a physical presence in New York in order to gain the privilege of direct-shipment, essentially requiring out-of-state wineries to become New York residents in order to compete on equal terms. <u>Id.</u> at 474, 475. Both regulatory schemes were manifest examples of patent discrimination, granting in-state wineries preferential access to state-consumers to the exclusion of all out-of-state wineries, and thus the Supreme Court had "no difficulty concluding that New York, like Michigan, discriminates against interstate commerce through its direct-shipping laws." <u>Id.</u> at 476.

## 2.   Arizona's Statutory Scheme Does Not Amount To Patent Discrimination

Plaintiffs cite an extensive number of cases in an effort to show that Arizona's statutory scheme offends the various "prohibited effects" of the Dormant Commerce Clause. Specifically, Plaintiffs list the following:

"The nondiscrimination principle [of the Dormant Commerce Clause] prevents a state from directly or indirectly banning out-of-state businesses from the local market, <u>Philadelphia v. New Jersey</u>, 427 U.S. 617, 624 (1978); raising the cost of out-of-state products in relation to in-state products[,] <u>West Lynn Creamery, Inc. v. Healy</u>, 512 U.S. 186, 193 (1994); <u>Oregon Waste Sys. Inc. v. Dep't of Envt'l Quality</u>, 511 U.S. 93 (1994)[;] requiring a nonresident to establish a physical presence in the state in order to do business, <u>Granholm v. Heald</u>, 544 U.S. at 475; <u>Halliburton Oil Well Cementing Co. v. Reily</u>, 373 U.S. 64, 72 (1963)[;] giving in-state producers preferential access to the market, <u>Granholm v. Heald</u>, 544 U.S. at 474[;] or requiring that out-of-state products

be processed locally prior to distribution.  C & A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383 (1994)."

(Dkt. #72, pp.8-9).  Plaintiffs contend that Arizona's statutory scheme produces all of these so-called prohibited effects.  (Id., p.9).

Plaintiffs argue that Arizona's in-person and gallonage cap exceptions violate Granholm because they effectively require out-of-state wineries that produce more than 20,000 gallons of wine per year to establish a physical presence in the state; violate C & A Carbone because without such an in-state presence, out-of-state wineries are forced to use local processors, i.e. Arizona wholesalers and retailers; violate West Lynn Creamery and Oregon Waste Systems because the extra costs tacked on by these middlemen raise the price of out-of-state wine in relation to in-state wine; and violate New Jersey because "hundreds of out-of-state producers that cannot find a wholesaler are totally excluded from the entire Arizona wine market."  (Dkt. #72, p.9).  But Plaintiffs seem to ignore the application of Arizona's statutory scheme to out-of-state wineries that produce less than 20,000 gallons of wine per year.  Plaintiffs also appear to exaggerate the application of their cited authority to the present circumstances.

Like Granholm, most of the other cases that Plaintiffs refer to involved State regulations that – unlike the Arizona scheme at issue here – manifestly discriminated against all out-of-state goods or products.  New Jersey, 437 U.S. 617 (1978) (prohibition on the importation of waste generated outside the state); Bacchus Imports, Ltd. v. Dias, 468 U.S. 263 (1984) (excise tax applied to imported liquor, but not to local pineapple wine); Chemical Waste Management, Inc. v. Hunt, 504 U.S. 334 (1992) (surcharge placed on in-state disposal of all hazardous waste generated outside the state); West Lynn Creamery, 512 U.S. 186 (1994) (nondiscriminatory tax coupled with subsidy only to in-state businesses that were affected by the tax); Or. Waste Sys., 511 U.S. 93 (1994) (surcharge placed on in-state disposal of waste generated outside the state); C & A Carbone, 511 U.S. 383 (1994) (ordinance requiring all of town's waste to be processed at town's transfer station); and Associated Indus. of Mo. v. Lohman, 511 U.S. 641 (1994) (use tax applied only to out-of-

1   state goods sold in the state).  Specifically, in <u>C & A Carbone</u>, the Supreme Court found

2   discriminatory a facially neutral city ordinance that required all nonhazardous solid waste

3   received and processed in the town to be deposited at the town's transfer station because it

4   favored the local waste management business to the exclusion of all non-local competition.

5   511 U.S. at 392 ("[The ordinance] at issue here squelches competition in the waste-

6   processing service altogether, leaving no room for investment from outside.").  Likewise, in

7   the other cases mentioned above, the state or local regulations at issue were invalidated

8   because they had a black and white discriminatory effect of benefitting in-state businesses

9   and clearly burdening or excluding all out-of-state businesses.  Each regulation created

10  market conditions that were clearly designed to favor in-state businesses by either completely

11  excluding or heavily burdening all out-of-state competition.

12      The more relevant cases cited by the parties are <u>Hunt v. Washington State Apple</u>

13  <u>Advertising Comm'n</u>, 432 U.S. 333 (1977), and <u>Minnesota v. Clover Leaf Creamery Co.</u>,

14  449 U.S. 456 (1981).  In <u>Hunt</u>, North Carolina enacted a facially neutral statute that required

15  all closed containers of apples sold or shipped into the state to display either the applicable

16  USDA grade or none at all.  As it turned out, all North Carolina apple growers already sold

17  their apples under no grade at all, and so were unaffected by this new statute.  However, a

18  number of states, including the State of Washington, already had expensive state inspection

19  and grading systems that their apple growers were required to follow.  Thus, the Supreme

20  Court found that the statute not only burdened interstate sales of Washington apples, but also

21  discriminated against Washington apple growers because the statute raised the cost of doing

22  business in North Carolina for all Washington apple growers while leaving their in-state

23  counterparts unaffected.  <u>Id.</u> at 350-51.  The statute had the effect of stripping away the

24  competitive and economic advantages that Washington apple growers had earned for

25  themselves.  <u>Id.</u>  Thus, the Court found that the North Carolina statute "insidiously operate[d]

26  to the advantage of local apple producers" and was patently discriminatory because it had no

27  effect on in-state businesses but placed out-of-state businesses at a competitive and economic

28  disadvantage by requiring that they change their business practices in order to sell their

1  products to North Carolina consumers.  Id.  The clear discriminatory effect of the North

2  Carolina law was to force local goods to constitute a larger share, and goods with an out-of-

3  state source to constitute a smaller share, of the total sales in the market.

4        In Clover Leaf, Minnesota enacted a facially neutral statute that prohibited the sale

5  of milk in plastic disposable containers, but allowed its sale in paper disposable containers.

6  As it turned out, Minnesota had a substantial paper industry and no plastics industry, so the

7  law substantially favored in-state businesses as opposed to out-of-state businesses.  And yet,

8  the Supreme Court held that the statute was not discriminatory in its effect on interstate

9  commerce.  The Court stated that "Minnesota's statute does not effect 'simple protectionism,'

10 but 'regulates evenhandedly' by prohibiting all milk retailers from selling their products in

11 plastic, nonreturnable milk containers, without regard to whether the milk, the containers, or

12 the sellers are from outside the State."  The entire out-of-state plastics industry was shut out

13 of the market, but out-of-state paper companies could still sell paper milk containers in the

14 state.  Thus, in Clover Leaf, even though the facially neutral state law excluded an entire

15 group of out-of-state businesses, the law was upheld because it only excluded some out-of-

16 state businesses from a particular state market.  Like Hunt, Clover Leaf concerns the ways

17 in which a state goes about regulating its markets.  A state may not erect barriers or gates to

18 economic markets if they in effect burden all or most out-of-state businesses and alter the

19 proportional share of the state market in favor of in-state businesses, such that out-of-state

20 businesses are thereafter unable to effectively compete in the in-state market.

21

22                              i.  Arizona's In-Person Exception

23        Plaintiffs challenge the in-person exception to Arizona's three-tiered distribution

24 system, which allows all wineries, in-state and out-of-state, to directly ship two cases of wine

25 per year to Arizona residents as long as they purchase the wine while they are physically

26 present on the winery premises.  The in-person exception is facially neutral – the law by its

27 own terms applies equally to in-state and out-of-state wineries.  Nonetheless, Plaintiffs argue

28 that the in-person requirement in effect creates an economic barrier that benefits in-state

1   wineries and burdens out-of-state wineries because "consumers cannot afford the time or cost

2   to travel such a distance [to out-of-state wineries] just to buy wine."  (Dkt. # 83, p.5).

3   Plaintiffs contend that the in-person exception violates Granholm and their list of "prohibited

4   effects" under the Dormant Commerce Clause, in effect requiring out-of-state wineries to

5   establish a physical presence in the state in order to effectively compete with in-state

6   wineries.  To support their contention, Plaintiffs cite the Court to Cherry Hill Vineyards,

7   LLC v. Hudgins, 488 F.Supp.2d 601 (W.D.Ky. 2006) and Baude v. Heath, 2007 WL

8   2479587 (S.D.Ind. 2007).

9        Hudgins involved an in-person exception that allowed licensed wineries producing

10  less than 50,000 gallons of wine per year to directly ship two cases of wine per visit to

11  Kentucky residents as long as they purchased the wine while physically present on the

12  winery premises. 488 F.Supp.2d at 605.  Baude involved an exception that allowed wineries

13  to directly ship unlimited amounts of wine per year to an Indiana resident, but only after the

14  resident provided certain information in an initial face-to-face transaction.   2007 WL

15  2479587 at *21.  The district courts in those cases concluded that the plaintiffs had shown

16  that the effects of the in-person exceptions on interstate commerce were not merely incidental

17  and thus not subject to lesser scrutiny under the Pike analysis (discussed supra pp. 9-10).

18  Specifically, the district court in Hudgins stated that "out-of-state wineries [would] have to

19  incur a substantial cost in order to meaningfully penetrate the Kentucky market" (488

20  F.Supp.2d at 616), and the district court in Baude compared the face-to-face barrier to

21  Indiana's direct shipment market to New York's physical presence requirement in Granholm

22  that effectively required out-of-state wineries "to establish a physical presence in the state

23  or accept the greatly reduced sales that might result from the occasional traveler."  2007 WL

24  2479587 at *23.  However, the Arizona scheme is quite different than the Kentucky and

25  Indiana schemes at issue in those cases; and this Court is not convinced that Arizona's in-

26  person exception creates an effect on interstate commerce that is patently discriminatory.

27        Plaintiffs challenge the part of Arizona's in-person exception that allows in-state and

28  out-of-state wineries to directly ship two cases of wine per year to Arizona residents as long

1   as they purchase the wine while on the winery premises.  Plaintiffs argue that this limited

2   direct shipment exception to Arizona's three-tiered distribution system amounts to patent

3   discrimination against interstate commerce.  However, Plaintiffs proffer no evidence to

4   suggest that such a limited exception, applicable to both in-state and out-of-state wineries,

5   erects a barrier to Arizona's wine market that in effect creates a burden that alters the

6   proportional share of the wine market in favor of in-state wineries, such that out-of-state

7   wineries are unable to effectively compete in the Arizona market.

8       Although it is true that Arizona wineries have a natural geographic advantage due to

9   their proximity to Arizona consumers, there is no indication that a limited two case per year

10  direct shipment allowance for wine purchased on winery premises somehow greatly reduces

11  the sales of out-of-state wineries in relation to sales of in-state wineries or that such an

12  exception requires out-of-state wineries to incur a substantial cost in order to meaningfully

13  penetrate the market.  The Dormant Commerce Clause does not require States to provide out-

14  of-state businesses with additional rights to compensate for existing advantages that in-state

15  businesses possess through geographic location.  Nothing in Granholm suggests that the

16  Supreme Court was concerned about equalizing the inherent marketing advantage that

17  accrues to in-state wineries because of their close proximity to a state's consumers.  The fact

18  that it might be more difficult for Arizona residents to travel to certain out-of-state wineries

19  in order to take advantage of the limited direct shipment exception created in the in-person

20  exception has no bearing on whether the exception effectuates patent discrimination against

21  interstate commerce.  Further, there is no indication whatsoever that the in-person exception

22  has any effect on the flow of interstate commerce; no indication that the exception creates

23  a system under which local goods constitute a larger share, and goods with an out-of-state

24  source constitute a smaller share, of the total sales in the market.

25

26              **ii.  Arizona's Gallonage Cap Exception**

27      Plaintiffs' primary challenge is to the gallonage cap exception to Arizona's three-

28  tiered distribution system, which allows in-state and out-of-state wineries that produce less

1    than 20,000 gallons of wine per year to directly ship wine to Arizona residents.  The

2    gallonage cap exception is facially neutral – the law by its own terms applies equally to in-

3    state and out-of-state wineries that produce less than 20,000 gallons of wine per year.

4    Nonetheless, Plaintiffs argue that the gallonage cap exception in effect creates an economic

5    barrier that benefits in-state wineries and burdens out-of-state wineries because wineries that

6    produce more than 20,000 gallons of wine per year are not allowed to directly ship wine to

7    Arizona residents (except for the limited direct shipment exception created by the in-person

8    exception), but must instead essentially adhere to Arizona's three-tiered distribution system.

9    (Dkt. #83, pp.5-6; Dkt. #74, pp.2-5).  Plaintiffs contend that the facially neutral gallonage cap

10   exception is simple economic protectionism, and that it grants in-state wineries preferential

11   access to the State's wine market because the majority of Arizona wineries produce less than

12   20,000 gallons of wine per year and have been issued domestic farm winery licenses to the

13   exclusion of hundreds of out-of-state wineries that produce more than 20,000 gallons of wine

14   per year.

15        However, preferential access to Arizona's wine market necessarily implies that in-

16   state wineries somehow economically benefit to the exclusion of out-of-state wineries.

17   Plaintiffs fail to mention that more than half of all U.S. wineries – approximately 2,000

18   wineries as of 2004 – are able to take advantage of the gallonage cap exception and directly

19   ship their wine to Arizona consumers.  In fact, the number of out-of-state wineries that

20   produce less than 20,000 gallons of wine per year and are thus able to take advantage of this

21   direct shipment exception dwarf the number of in-state wineries that are able to take

22   advantage of the exception.  In addition, almost twice as many out-of-state wineries than in-

23   state wineries have already obtained domestic farm winery licenses.

24        The simple fact that there are more out-of-state wineries than in-state wineries that

25   produce more than 20,000 gallons of wine per year and are thus required to adhere to the

26   three-tiered distribution system in order to gain access to Arizona's wine market does not by

27   itself establish patent discrimination in effect against interstate commerce.  Compare Clover

28   Leaf, 449 U.S. at 473 (upholding a statutory scheme that significantly benefitted in-state

1   businesses), with <u>Granholm</u>, 544 U.S. at 473-75 (invalidating two state laws that in effect
2   excluded all out-of-state competition).  If that is all that is required to establish patent
3   discrimination, then Arizona's statutory scheme would be subject to heightened scrutiny
4   under the Dormant Commerce Clause.  However, that same scheme would likely be
5   considered an incidental burden on interstate commerce and thus subject to lesser scrutiny
6   under <u>Pike</u> analysis (discussed <u>supra</u> pp. 9-10) if utilized in states that have a greater number
7   of wineries producing more than 20,000 gallons of wine per year, because those states would
8   then have a greater number of in-state wineries that would be subject to the three-tiered
9   distribution system. Thus, the decision regarding whether a statutory scheme is per se invalid
10  or subject to the <u>Pike</u> analysis would merely depend on the statistical disparity in the amount
11  and size of in-state and out-of-state wineries.  Precedent does not dictate that result, nor does
12  common sense compel it.

13       First, the Court remains conscious of the "unquestionable legitimacy" of the three-
14  tiered distribution system.  Second, the question at issue here, as in other similar cases
15  involving states' three-tiered distribution systems, is how a state may go about creating
16  exceptions to its three-tiered system in order to create a less regulated, but not fully
17  unregulated, wine market. Plaintiffs essentially argue that a state has only two options, either
18  to apply the three-tiered distribution system to all wineries, or to completely abolish the
19  three-tiered distribution system. However, those are not the results dictated by <u>Granholm</u> and
20  the anti-discrimination norm of the Dormant Commerce Clause.

21       Nevertheless, Plaintiffs contend that Arizona's facially neutral gallonage cap
22  exception operates much the same as the New York scheme in <u>Granholm</u>.  Plaintiffs argue
23  that Arizona's gallonage cap exception in effect requires out-of-state wineries that produce
24  more than 20,000 gallons of wine per year to establish a physical presence in the state.
25  Otherwise they would have to endure hefty middleman markups under the three-tiered
26  distribution system that raise the price of out-of-state wines in comparison to in-state wines
27  and exclude out-of-state wineries that are not able to find state-licensed wholesalers to carry
28  their product.  However, the gallonage cap exception is nothing like the New York statutory

1    scheme in <u>Granholm</u>.  The New York scheme in that case actually required out-of-state

2    wineries to establish a physical presence in the state, and in effect become New York

3    residents in order to take advantage of New York's direct shipment exception from its three-

4    tiered distribution system.  But under Arizona's statutory scheme, even if an out-of-state

5    winery that produces more than 20,000 gallons of wine per year does establish a physical

6    presence in Arizona, it would still be prohibited from shipping its wine directly to Arizona

7    retailers and consumers because the three-tiered system applies to both in-state and out-of-

8    state wineries that produce more than 20,000 gallons of wine per year.  Thus, establishing

9    a physical presence in Arizona would not allow out-of-state wineries that produce more than

10   20,000 gallons of wine per year to make use of the direct shipment advantage under the

11   gallonage cap exception.

12        The Dormant Commerce Clause is not merely concerned with whether some

13   businesses must endure hefty middleman markups or whether some businesses are unable

14   to reach an agreement with a licensed wholesaler in order to access a state's market.  Nor is

15   it merely concerned with alleged discrimination based on winery location or winery size.  For

16   the reasons stated above, those issues are troublesome under the Dormant Commerce Clause

17   only to the extent that they in effect constitute a barrier to a state's market by altering the

18   proportional share of the market in favor of in-state businesses.

19        Plaintiffs are correct in citing the Court to <u>Associated Indus. of Mo. v. Lohman</u>, 511

20   U.S. 641 (1994), for the proposition that discrimination should be measured in dollars and

21   cents, such as in lost sales.  But again, lost sales are not by themselves evidence of patent

22   discrimination, because surely out-of-state wineries are subject to lost sales under the

23   "unquestionably legitimate" three-tiered distribution system.  Lost sales are troublesome

24   under the Dormant Commerce Clause and the Twenty-First Amendment only to the extent

25   that a state's statutory scheme is designed to favor in-state wineries, such that in-state

26   wineries are able to gain a greater share of the market.  But Plaintiffs have not established

27   that Arizona's in-person and gallonage cap exceptions to the State's three-tiered distribution

28

1   system somehow alter the proportional share of the State's wine market in favor of in-state

2   wineries.

3          The state and local regulations at issue in the plethora of cases cited by the Plaintiffs

4   were invalidated because they had explicit discriminatory effects of benefitting in-state

5   businesses and burdening or excluding all or most out-of-state businesses.  Each regulation

6   in those cases created market conditions that were clearly designed to favor in-state

7   businesses by either completely excluding or heavily burdening all or most of the out-of-state

8   competition.  In Granholm, both the Michigan and New York laws were explicitly designed

9   to favor all in-state wineries by effectively barring all out-of-state wineries from taking

10  advantage of the states' direct shipment exceptions to their three-tiered distribution systems.

11  Id. at 475.  And in Hunt, the clear discriminatory effect of the North Carolina law was to

12  force local goods to constitute a larger share, and goods with an out-of-state source to

13  constitute a smaller share, of the total sales in the market.  However, in Clover Leaf, even

14  though the facially neutral Minnesota statute excluded an entire group of out-of-state and in-

15  state businesses, of which there were few in-state businesses, and favored another group of

16  in-state businesses, the law was not considered patently discriminatory because it still

17  allowed a significant number of out-of-state businesses to compete with in-state businesses

18  in the State's market.

19         Like Clover Leaf, Arizona's gallonage cap exception only burdens one group of

20  businesses – in-state and out-of-state wineries that produce more than 20,000 gallons of wine

21  per year – from obtaining direct shipment access to Arizona residents.  But in Clover Leaf,

22  the Minnesota statute completely excluded manufacturers of plastic milk containers from

23  competing in the State's milk container market.  Here, under Arizona's statutory scheme,

24  although wineries that produce more than 20,000 gallons of wine per year are not granted

25  direct shipment access to Arizona consumers, those wineries may still gain access to the

26  consumers through the State's three-tiered distribution system.  Further, in Clover Leaf,

27  Minnesota's substantial in-state paper milk container industry clearly benefitted from the

28  statute, whereas here, Arizona's gallonage cap exception is available to a far greater number

1    of out-of-state wineries than in-state wineries.  Well more than half of the wineries across the

2    country produce less than 20,000 gallons of wine per year and are thus eligible to take

3    advantage of the gallonage cap exception under Arizona's domestic farm winery permit; and

4    indeed, more out-of-state wineries than in-state wineries have already obtained domestic

5    farm winery licenses.  Thus, contrary to Plaintiffs' arguments, Arizona's gallonage cap

6    exception does not restrict the flow of interstate commerce in favor of in-state wineries and

7    in effect opens up the State's wine market to allow more out-of-state wineries than in-state

8    wineries to take advantage of Arizona's gallonage cap exception and directly ship to Arizona

9    consumers.

10          Plaintiffs must offer substantial evidence of an actual discriminatory effect in order

11   to take advantage of heightened scrutiny and shift the burden of proof to the State; but such

12   evidence is absent here.  Plaintiffs have offered no indication that Arizona's in-person and

13   gallonage cap exceptions create a market under which local goods constitute a larger share,

14   and goods with an out-of-state source constitute a smaller share, of the total sales in the

15   market.  The mere fact that more out-of-state wineries than in-state wineries are required to

16   adhere to Arizona's three-tiered distribution system is not by itself sufficient to establish that

17   Arizona's statutory scheme is patently discriminatory in effect against interstate commerce.

18   That fact at best supports the contention that Arizona's statutory scheme places an incidental

19   burden on interstate commerce.  If the Court were to find otherwise, then no distinction

20   would exist between statutes that are patently discriminatory in effect and those that are

21   subject to the incidental burden test under the Pike analysis.  This Court is not inclined to

22   abolish that distinction.

23

24   **III.    Conclusion**

25          In sum, Plaintiffs have not carried their burden of showing that the challenged

26   statutory scheme is patently discriminatory in effect.  In addition, Plaintiffs do not challenge

27   Arizona's statutory scheme under the Pike analysis (see supra pp. 9-10), and thus expressly

28   fail to carry their additional burden of establishing that the Arizona statutory scheme's

burden on interstate commerce is clearly excessive in relation to the putative local benefits. As such, the Court need go no further.  And although Intervenor-Defendant has moved to exclude the affidavit of William M. Nelson, the Court finds that the information contained in that affidavit is ultimately inconsequential to the determination of this matter and is thus moot.

Accordingly,

IT IS HEREBY ORDERED that Intervenor-Defendant's motion to exclude the affidavit of William M. Nelson (Dkt. #82) is DENIED as moot.

IT IS FURTHER ORDERED that Plaintiffs' motion for summary judgment (Dkt. # 72) is DENIED.

IT IS FURTHER ORDERED that Defendants' cross-motions for summary judgment (Dkt. #s 75, 76) are GRANTED.

IT IS FURTHER ORDERED that the Clerk of the Court is directed to enter judgment accordingly.

DATED this 26th day of February, 2008.

_____
Mary H. Murgula
United States District Judge